UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
|     Plaintiff, | § | |
| v. | § | Cause No. EP-14-CR-0239-FM |
| | § | |
| FRANK OCHOA, | § | |
|     Defendant. | § | |

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS AND BRIEF IN SUPPORT

Comes now the Government by and through the undersigned Assistant United States Attorney and files this the Government's Response to Defendant's Motion to Suppress in the above entitled and numbered cause. The United States opposes Defendant's requested rulings and requested relief. Furthermore:

## I. SUMMARY OF THE FACTS[1]

The following facts are taken from federal agents' government reports and preliminary interviews with the law enforcement officers involved.

On January 29, 2011, at approximately 2:00pm, the El Paso Fire Department (EPFD) responded to an activated alarm at the Austin Foam Plastics warehouse located at 11350 James Watt, El Paso, Texas. . Firefighters discovered that a large amount of stacked cardboard boxes

---

[1] Several exhibits have been submitted to the Court as attachments to the Defendant's Motion to Suppress, specifically, the transcripts of the two interviews at issue, as well as the audio recordings. The United States stipulates to their admissibility and agrees that Court review of them is essential for resolution of the issues at hand. They are the best evidence of precisely what was said by everyone at the interviews. The United States anticipates calling several witnesses to testify about the circumstances and environment of the Defendant's interviews to supplement the transcripts and recordings.

near the west section of the warehouse were smoldering and on fire.  Firefighters extinguished the smoldering fire and requested an investigator to the scene.

Alcohol, Tobacco and Firearms (ATF) Special Agent (SA) Francisco Ortega and El Paso Fire Department (EPFD) Investigator Nicolas Torres responded to the scene, along with other investigators. ). A gasoline can was found at the scene of the fire. No machinery at Austin Foam operated on gasoline; there was no reason for that gasoline can to be in the building. Investigators sufficiently eliminated all potential accidental causes throughout the structure , and ultimately concluded the fire to be arson (incendiary: caused by an open flame put to an ignitable liquid that was intentionally poured to available combustible materials inside the warehouse).

Defendant Frank Ochoa was let go from his employment with Austin Foam January 28, 2011, the day before the fire.

Subsequent investigation of the case revealed two eyewitnesses who were Austin Foam employees who saw Defendant Ochoa near the scene of the fire (across the street) sometime after it had been started. Defendant Ochoa had no legitimate reason to be at Austin Foam on the day of the fire. Defendant Ochoa was seen in the parking lot of the business park across the street as the building burned.  Ochoa was parked next to the building, backed into the parking space. Ochoa appeared as if he was a spectator to the fire, according to one of the employees.  Ochoa was looking at the smoke and fire and the firefighters at the warehouse.  Ochoa was in his vehicle, a dark blue Chrysler PT Cruiser.

Another Austin Foam employee said that Ochoa called her the day of the fire soon after she left the warehouse (at about 12:05pm). She thought it strange, because she had never received a personal telephone call from Ochoa before that time. She worked the Saturday morning of the fire until about noon, as she often did. She said Ochoa got on the phone and

asked her if she was at Austin Foam and she told Ochoa she had just gotten off of work. Ochoa thanked her for how she treated him during his time at Austin Foam Plastics.

### March 22, 2011 questioning at EPFD:

On March 21, 2011, ATF Special Agent Francisco Ortega went to Mr. Ochoa's aunt's house looking for him. Agent Ortega left his contact information, and Mr. Ochoa called him back. Agent Ortega asked Mr. Ochoa to go to the EPFD office, and he would meet him there on March 22, 2011.

Mr. Ochoa arrived at the EPFD office (near Montana & Airway Blvd. in El Paso) on March 22, 2011 and waited for 15 to 20 minutes in the lobby before Agent Ortega and ATF Special Agent Joshua Johnson arrived. This building was/is not a standard fire station, but rather an office building. Ochoa was treated respectfully and professionally throughout his time at the station. Agents Ortega and Johnson lead Mr. Ochoa into a conference room (employee break room) and interrogated him with the assistance of EPFD Investigators Joe Muela and Nicolas Torres. Ochoa was not under arrest at that time.

The employee break room had a sink, counter, microwave, a long table and large screen TV near a window. There were several chairs around the table. The door was closed for privacy because it was in a high-traffic area next to a main entrance. Four people were in the room with Ochoa: Ortega and Johnson (in plain clothes) and Muela and another EPFD investigator in uniform (which included visible badges and firearms). Ortega advised Ochoa that they wanted to speak to him about the fire at Austin Foam Plastics. No statements or questions about detention were made. Initial conversations were in English and Ochoa gave no indications of misunderstanding.

SA Frank Ortega began the recorded interview and EPFD investigator Jose Muela arrived shortly thereafter. Muela took over questioning and Ortega stayed in the room.

Ochoa stated that he spoke Spanish and understood English but requested that the interview be conducted in Spanish. The interrogation lasted an hour and 15 minutes. Investigator Torres arrived approximately 20 minutes into the interrogation, and Investigator Muela left shortly thereafter.. Approximately 15 minutes later, Mr. Ochoa asked if he could go to the restroom. Torres escorted him to the nearest restroom (to show Ochoa where it was and it was in a secure area) and brought him back to the conference room. Ochoa made several statements about his time working at Austin Foam Plastics, his final day, his whereabouts on the day of the fire, and how he found out about the fire. He explained he was not at Austin Foam Plastics on the day of the fire; he was at church and with his family in Socorro, Texas.

The agents told Ochoa that other people said he was at Austin Foam Plastics the day of the fire and that the agents had video showing Ochoa's car was there. Mr. Ochoa responded that there would be no reason for people to say he was there. He said he was willing to take a polygraph. Agent Ortega explained that there were certain items left behind at the fire that might have Ochoa was willing to provide DNA. Investigator Torres told Ochoa that other Austin Foam Plastics employees said Mr. Ochoa was the one who started the fire. Agent Ortega cautioned that if they find out that Mr. Ochoa lied to them, then he could face more charges. Agent Ortega also told Ochoa that his cousin could face charges if she was present when Ochoa committed an act for the arson. At the end of the interrogation, agents discussed getting a polygraph for a Spanish speaker, and Mr. Ochoa was allowed to leave the EPFD office on his own schedule because he had a previously scheduled appointment with his cousin. Investigators made no efforts to impede

4

his exit. Investigators gave him their business card and asked him for his cellular telephone number to get in touch with him in the future.

**2014 Arrest & Interrogation**;

On February 12, 2014, the Government filed a one-count Indictment charging Mr. Ochoa with malicious damage in violation of 18 U.S.C. § 844(i). Ochoa was arrested on March 13, 2014. (Arrest Warrant Return, ECF No. 14.) That day, SA Torres and Special Agent Keith. Rodriguez interrogated Ochoa at the El Paso ATF office. Torres read the rights on the *Miranda* form in Spanish to Ochoa. Torres told Ochoa that he needed to read the form. When Investigator Torres read the form in English, he further explained that signing the waiver indicates that the rights were read to Ochoa, that he understood the rights, and that "'at this time you're willing to answer questions with no lawyer present. No promises or threats have been made to me. No pressure or force of any kind has been used against me.' In other words, we won't ask you anything that you don't want to answer." Ochoa signed and printed his name on the Miranda form.

Investigator Torres began the questioning in English, asking Ochoa for his biographical information and a description of his employment with Austin Foam Plastics. Ochoa responded in English until the answers became more complicated, and he then responded in Spanish.

Torres told Ochoa that he could respond in Spanish if that's easier, and Ochoa did so. Another person interrupted the investigation to ask, in Spanish, for consent to search Ochoa's phone. Ochoa reviewed the form in silence for 42 seconds.. He then asked the person for clarification about what the consent was for, and the person explained it was for everything from the phone, including calls, photos, and contact information. Ochoa then refused to sign the consent. This conversation about consent to search the phone was in Spanish.

Investigator Torres continued questioning in English, but Ochoa would respond in Spanish. Occasionally, Torres would question Ochoa in Spanish. Ochoa asked certain English questions to be clarified. For example, when Torres asked, "do you remember how you found out about the fire?," Ochoa responded, "Como?" Torres attempted to repeat the question in Spanish, and Mr. Ochoa responded in Spanish after another agent rephrased the question in Spanish. This continued throughout the interrogation. Torres primarily posed questions in English, Ochoa responded in Spanish, and occasionally Torres or another interrogator would question in Spanish, usually after it was clear that Ochoa did not understand the English question. Ochoa maintained that he was not at Austin Foam Plastics on the day of the fire.

## II. ISSUES AND ARGUMENT

Defendant Ochoa challenges the admission of his oral statements to law enforcement agents on two grounds. First, Mr. Ochoa was subjected to custodial interrogation in 2011 without being advised of his Miranda rights. Second, Mr. Ochoa was improperly advised of his Miranda rights in 2014, rendering his waiver invalid. Each of these is addressed in turn:

### At the 2011 Interrogation, Defendant Ochoa was NOT in Custody, therefore, no Miranda Warnings were Warranted

"Miranda warnings must be administered prior to 'custodial interrogation.'" *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988). This rule protects against the "possibility of coercion inherent in custodial interrogations," by creating "a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief." *United States v. Patane*, 542 U.S. 630, 639 (2004). Statements obtained without the required administration of Miranda warnings must be suppressed. *Id.* at 643.

Under *Miranda*, "interrogation" refers to words or actions on the part of law enforcement agents that the agents "should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). ***For purposes of the legal issues at bar, the United States stipulates and agrees that Defendant Ochoa was "interrogated" at both interviews (in 2011 and 2014).***

The question here is, was Ochoa in custody? A defendant is "in custody" for *Miranda* purposes when "taken into custody or otherwise deprived of his freedom of action in any significant way." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*quoting Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). For purposes of the legal issues at bar, the United States disagrees with Defendant Ochoa—he was NOT "in custody".

To make this "in custody" determination, a court considers: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012) (internal quotation marks omitted). No single factor is determinative; rather, courts consider the "'totality of circumstances.'" *Id.* (*quoting Beheler*, 463 U.S. at 1125).

For instance, "'detention of approximately an hour raises considerable suspicion' that an individual has been subjected to a custodial interrogation." *Id.* at 194 n.1 (*quoting United States v. Harrell*, 894 F.2d 120, 124 n. 1 (5th Cir. 1990)). Other factors include "the point when the detainee offers the incriminating remarks, the place of the interrogation, the public nature of the detention, and the number of police interrogators." *Harrell*, 894 F.2d at 124. A reasonable person might expect questioning at the stationhouse to be prolonged until the interrogators get the

7

answers they seek and that it would be a police-dominated atmosphere out of the public view. *United States v. Bengivenga*, 845 F.2d 593, 598 (5th Cir. 1988).

In *Oregon v. Mathiason*, 429 U.S. 492 (1977) the US Supreme Court held that a suspect who voluntarily came to a police station to be interviewed about a burglary was not "in custody" for Miranda purposes, therefore Miranda did not apply. Id.

In *Mathiason*, an Oregon state police officer suspected Carl Mathiason of burglary and asked him to come to the police station for questioning. Mathiason came freely, spoke with the officer, and was not arrested at the time. He was arrested later and a trial court used evidence obtained during the questioning to convict him. Mathiason moved to suppress the evidence since he was not read his *Miranda* rights before the questioning. The court admitted the evidence since Mathiason was not in custody during the questioning. The Oregon Court of Appeals affirmed. The Supreme Court of Oregon reversed since it found that Matianson was in a "coercive environment" when questioned and therefore deserved to hear his *Miranda* rights. *Id*.

The US Supreme Court, in a *per curiam* decision, held that its decision in *Miranda v. Arizona* only required law enforcement officials to recite a suspect's rights when suspect had been "deprived of his freedom of action in any significant way." The Court determined that in the case there was "no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way." Even if the police coercively pressured Mathiason during the interview, he came to the police station freely and was free to leave at any time. Therefore Miranda rights did not apply. *Id*.

"Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' Any interview of

one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Id*.

Similarly, *Barfield v. Alabama*, 552 F.2d 1114 (5th Cir. 1977) held that a woman who was pointed out as possible suspect in a murder case, who went to police station voluntarily, and who was not physically restrained in any manner and was in fact left alone on at least one occasion, was not "in custody" at time police sergeant overheard her inculpatory statements. The Court noted, a noncustodial situation is not converted to one in which Miranda applies simply . . . because the questioned person is one whom the police suspect. *Barfield citing Oregon v. Mathiason*, 429 U.S. 492 (1977).

Mr. Ochoa was NOT detained as discussed in *Bengivenga*, (discussed *supra)* and certainly NOT "in custody" associated with formal arrest, and he was treated politely and professionally the entire time he was at the EPFD building. Ochoa voluntarily called Investigator Torres after learning that Torres had gone to Mr. Ochoa's aunt's house looking for him. Torres asked (not "instructed" as claimed in the Defendant's brief) Ochoa to meet him at the EPFD office, and Mr. Ochoa agreed.

Ochoa was never told he was detained, nor was he told he was free to leave—the subject was never mentioned. Ochoa was free to leave at any time, and indeed, he left for his previously scheduled appointment. Ochoa chose when to end the interview and leave the building. The audio recording and transcript reveal an engaged, confident interview by all parties and nothing suggests he was intimidated or coerced into staying longer than he wished.

Although some factors may weigh in favor of the Defendant on the issue of whether he was "in custody" (the presence of multiple officers/investigators, he was suspected of setting the fire, etc.) these factors do not warrant a finding of "in custody" for purposes of *Miranda*. Under similar circumstances the US Supreme Court found the suspect was not "in custody" in the *Mathias* case cited *supra*. Similarly, the Fifth Circuit in *Barfield* found the suspect was not "in custody (*supra*).

### At the 2014 Custodial Interrogation, Defendant Ochoa Voluntarily and Knowingly Waived his *Miranda* Rights

In order to be valid, a *Miranda* waiver must voluntary. Whether or not a waiver is voluntary has "two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*; *see United States v. Hearn*, 563 F.3d 95, 104 (5th Cir. 2009). "The question of waiver must be determined on the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *N. Carolina v. Butler*, 441 U.S. 369, 374-75 (1979) (internal quotation marks omitted)).

*California v. Prysock*, 453 U.S. 355 (1981) held there is no rigid rule requiring that the content of the warnings to an accused prior to police interrogation required by *Miranda v. Arizona*, 384 U.S. 436 be a virtual incantation of the precise language contained in the *Miranda* opinion. *Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures. *Id*. The Court in that case (*Miranda)* stated that "[t]he warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant." *Quoting Miranda* at 476, 479. An imperfect advisement of *Miranda* rights is adequate, as long as the essence of those rights are conveyed to the accused.

Defendant Ochoa was advised of his *Miranda* rights by EPFD investigator Nicolas Torres and Ochoa signed a waiver and agreed to speak with the officers/agents. Torres was familiar with Ochoa, as he had interviewed him in 2011. Torres spoke to Ochoa in both English and Spanish to get a feel for which language Ochoa preferred, and the interview proceeded in primarily Spanish. The first two pages of the transcript of the interview illustrate Torres complied with the essence of *Miranda*—the right to remain silent, the fact that his (Ochoa's) statements could be used against him in court, the right to an attorney, the right to an attorney free of charge if he could not afford one, and acknowledgement of an understanding of the *Miranda* rights. Torres also said he (Ochoa) could stop the questioning at any time.

The evidence before the Court shows that Defendant Ochoa voluntarily, knowingly and intelligently waived his *Miranda* rights, therefore the Defendant's motion should be denied.

## IV. EVIDENTIARY HEARING

A proponent of a Motion to Suppress has the burden of proving, by a preponderance of the evidence that the evidence in question was obtained in violation of his or his rights. *United States v. Guerrero-Barajas*, 240 F.3d 428, 431 (5th Cir. 2001); *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999); *United States v. Runyan*, 290 F.3d 223, 235 (5th Cir. 2002).

The majority of Defendant's motion alleges conclusory allegations. Reliance on such conclusory allegations is insufficient. A defendant must present "definite, specific, detailed and nonconjectural" facts that justify relief before a district court should grant a suppression hearing. *United States v. Dean*, 100 F.3d 19 (5th Cir. 1996)(quoting *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983). An evidentiary hearing is currently scheduled for Monday, June 13 2016 at 10:00am.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the Government respectfully requests that the Defendant's Motion to Suppress be denied in its entirety.

Respectfully submitted,

RICHARD L. DURBIN
UNITED STATES ATTORNEY

BY: /s/
RICHARD D. WATTS
Assistant U.S. Attorney
NM Bar # 9059
700 E. San Antonio, Suite 200
El Paso, Texas  79901
(915) 534-6884

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of June, 2016, a true and correct copy of the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF System which will transmit notification of such filing to the following CM/ECF participant: Andrew Steed, Attorney for Defendant Frank Ochoa.

/s/
RICHARD D. WATTS
Assistant U.S. Attorney

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
|     **Plaintiff,** | § | |
| **v.** | § | **Cause No. EP-14-CR-0239-FM** |
| | § | |
| **FRANK OCHOA,** | § | |
| **Defendant.** | § | |

## **ORDER**

On this date, came on to be considered the Defendant's Motion to Suppress in the above entitled numbered cause. The Court having considered the same, is of the opinion that said Motion should be denied

IT IS THEREFORE ORDERED that the Defendant's Motion to Suppress be DENIED.

SIGNED and ENTERED this _____ day of _____, 2016.

                                                                                       _____
                                                                                       FRANK MONTALVO
                                                                                       UNITED STATES DISTRICT JUDGE